2023 IL App (2d) 230205-U
No. 2-23-0205
Order filed December 12, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE of PHILLIP MICHAEL JOHNSON, f/k/a Phillip Michael Gorrill, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | No. 18-DV-938 |
| JESSICA ANN GORRILL, | ) ) | Honorable Justin M. Hansen, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court did not err in denying petitioner's October 4 petition for rule to show cause, failing to rule on the March 14 petition for rule to show cause, reviewing petitioner's admitted evidence at the April hearing, reallocating petitioner's parenting time and refusing to modify his decision making responsibilities, and excluding exhibit No. 85. Affirmed.

¶ 2   Petitioner, Phillip M. Johnson, *pro se*, appeals from a hearing held between April 10 and 14, 2023, disposing of several motions. He contends that the circuit court erred in, (1) denying his petition for rule to show cause based on respondent's, Jessica Ann Gorrill's, failure to place R.G., their child, in counseling, (2) failing to provide findings on the petition for rule to show cause

based on respondent's alleged violation of the parenting plan, (3) improperly considering evidence that was not presented during the hearing, (4) decreasing his parenting time, (5) denying his motion to reallocate parental responsibilities, and (6) excluding exhibit No. 85 (an Illinois Medical Comprehensive Assessment of Needs and Strengths (IM-CAN) report) from evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Petitioner and respondent were married in 2013. Petitioner petitioned to dissolve the marriage in 2018. One child, R.G., was born to the couple during the marriage.

¶ 5     On June 27, 2019, the parties filed an agreed parenting plan that stated that they would have shared decision-making responsibilities in all realms except that respondent would be solely responsible for decisions relating to R.G.'s education and health. However, the parties agreed that they would share all information and records. The parenting plan also noted that respondent was the primary residential parent, and that petitioner would have the following parenting time: every Tuesday from 7:00 a.m. until Thursday at 6:15 a.m. and every other Friday from 7:00 p.m. until Sunday at 7:00 p.m.

¶ 6     In November 2019, respondent moved to modify the agreed parenting plan to reflect the parties' course of conduct. The next month, she filed an amended motion, alleging that petitioner was only sporadically exercising his weeknight parenting time and was not exercising his weekend parenting time. She sought to limit his parenting time to two weekday overnights per week and require at least 48 hours' notice if he was not going to exercise his parenting time that week.

¶ 7     The next year, in October 2020, the circuit court dissolved the parties' marriage and denied respondent's motion to modify the parenting plan. The court determined that she failed to show a significant change in circumstances based on petitioner's failure to exercise his parenting time since, at the time of the hearing, he was utilizing his parenting time. Moreover, the court stated

that it did not hear any evidence indicating that reducing petitioner's parenting time would be in R.G.'s best interests.

¶ 8 During the pendency of the case, various petitions for orders of protection were filed by both parties. On August 6, 2021, the parties agreed to dismiss petitioner's petition for an order of protection and to seal the motions, responses, and exhibits. R.G. was also to attend counseling pursuant to the order. Additionally, on this date, petitioner moved to obtain make-up parenting time for time that was lost because of respondent's order of protection.

¶ 9 On September 27, 2021, respondent, again, moved to modify petitioner's parenting time. She alleged that R.G. attending school, and petitioner's refusal to transport him to school, was a substantial change in circumstances that warranted modification. She noted that the parenting-time schedule was informally amended in March 2021 to grant petitioner parenting time on Thursdays at 5:30 p.m. until Saturdays at 10:00 a.m. and, on alternate weeks, he would have R.G. on Thursdays from 5:30 p.m. until Sundays at 4:00 p.m. However, petitioner was failing to transport R.G. to school on Friday mornings. She sought to eliminate his weekday parenting time to prevent R.G. from missing school. In response, petitioner agreed that a substantial change in circumstances existed because of respondent's move to a new city, which made transporting R.G. more difficult than when the parenting plan was instituted. He, however, asserted that it would not be in R.G.'s best interests to further reduce his parenting time.

¶ 10 Petitioner petitioned for a rule to show cause on October 4, 2021. Therein, he claimed that respondent failed to seek counseling for R.G. (based on the August 6 agreed order) and she refused to discuss placing R.G. in an after-school program addressing social-emotional coping mechanisms. He sought temporary custody of R.G. to enroll him in counseling. Respondent denied

that she had refused counseling for R.G. and stated that there was no agreed timeframe for enrollment.

¶ 11    Then, on June 6, 2022, petitioner moved to modify parenting time and decision making responsibilities. He alleged that respondent neglected her role as the primary parent by alienating R.G. from him; refusing attempts to coparent; failing to share significant decision making responsibilities; failing to inform him of significant decisions relating to R.G.'s school, health, psychological, and recreational resources; refusing to address school bullying; and allowing R.G. unsecured access to firearms. He sought primary decision making responsibility, primary parental responsibility, and an order allowing R.G. to attend school in another school district. In response, respondent acknowledged that the parties share significant decision making responsibilities except for health and education related decisions, which she makes. She also asserted that petitioner had access to all of R.G.'s school personnel and medical providers and could seek records from the source, as the parenting plan does not require her to furnish records to him.

¶ 12    Thereafter, petitioner moved to obtain a passport for R.G. and have him vaccinated against COVID-19. Respondent responded that she had sole decision making responsibility regarding health-related decisions. Additionally, she stated that she was concerned that R.G.'s receipt of a passport would be used as an opportunity for petitioner to kidnap R.G. since he recently changed his surname without notifying the court, he was in a relationship with a woman of Asian descent whose immigration status was unverified, and he failed to disclose his employment and financial status to the court. Petitioner replied and objected to respondent's "racial harassment" and "intentional infliction of emotional distress" to himself and his family. He also asserted that her court filings were a tactic to alienate him from R.G.

¶ 13    On September 27, 2022, petitioner petitioned for a rule to show cause, arguing that respondent violated the agreed parenting plan entered on June 27, 2019. She was given 21 days to respond to the petition. Respondent timely moved to dismiss the petition, arguing that petitioner failed to state a cause of action, because he failed to: (1) identify the nature of the contempt; (2) seek appointment to prosecute; (3) include cautionary language; (4) request arraignment; (5) state the nature, scope, and duration of punishment sought; (6) provide for purge; and (7) detail appropriate relief. On October 28, 2022, petitioner was granted 21 days to respond to the motion to dismiss. This order also noted that the parties were not permitted to file any new motions or petitions without prior leave of court. On December 1, 2022, the court granted the motion to dismiss; however, it granted petitioner leave to file an amended petition within 21 days.

¶ 14    On November 17, 2022, the guardian *ad litem* (GAL) issued her recommendation to modify the parenting schedule and find, *inter alia*, that it was not in R.G.'s best interests to reallocate any of the decision making responsibility to petitioner.

¶ 15    On March 14, 2023, petitioner requested leave to file an amended rule to show cause; however, he noted that he was previously granted leave to file this motion on October 26, 2022, but the filing was rejected due to a scrivener's error. Petitioner alleged that respondent failed to disclose information related to R.G. attending counseling, provide adequate dental care, allow him access to R.G., and list him as an emergency contact at R.G.'s school. A notice of hearing was never filed.

¶ 16    Between April 10 and 14, 2023, a hearing was held addressing the following motions: (1) petitioner's August 6, 2021, motion for make-up parenting time; (2) petitioner's October 4, 2021, petition for rule to show cause; (3) petitioner's June 6, 2022, motion for reallocation of parenting time and modification of the parenting agreement; (4) petitioner's June 16, 2022, motion to obtain

a passport for R.G.; (5) petitioner's June 16, 2022, motion to vaccinate R.G. against COVID-19; (6) respondent's September 27, 2021, motion to modify parenting time and child support; and (7) respondent's October 19, 2022, motion for interim fees and costs. At the inception and close of the hearing, the court read the foregoing list and the parties were directed to object if a motion was missing. Neither party objected.

¶ 17     At the hearing, Denise Kuzniewski, the GAL, testified that she created a report relating to her investigation and her recommendations concerning R.G.'s best interests. Overall, she believed that R.G. was doing well in his community, family, and school and he was mentally and physically healthy. However, she noted that R.G. had been exposed to information pertaining to this case and that needed to cease.

¶ 18     Kuzniewski related that there were significant communication barriers between the parties. Over the course of Kuzniewski's testimony, petitioner referenced and admitted exhibit No. 5, which consisted of approximately 119 pages of communications between the parties, Kuzniewski, and the attorneys. The court stated,

> "I don't want there to be a misunderstanding that although I will look at the entirety of the exhibits, I'm not parsing through 150 pages of things—you should not expect that I will parse through 150 pages of documents and glean from it what you are hoping for me to glean from it.
>
> ***
>
> Don't anticipate that I can guess the meaning of the document to you if you haven't asked a witness a question about it."

The court repeatedly clarified for petitioner that it reviews all the exhibits after they are admitted.

¶ 19    Regarding parenting time, respondent testified that there was an agreed parenting plan in place, from which the parties informally deviated. The agreed parenting plan was entered into when R.G. was four years old, and the divorce was finalized when R.G. was about five years old. At the time the plan was entered, R.G. was not in school, but he was in second grade at the time of the hearing. During COVID-19, R.G. participated in virtual learning. The parties entered into the informal parenting agreement prior to R.G. beginning hybrid learning (school was part-time virtual and part-time in-person). After R.G. returned to full-time, in-person learning, when petitioner exercised parenting time under the informal plan, R.G. missed school on Fridays. Additionally, respondent was not able to exercise full weekends with R.G., but she wished to. The informal parenting plan was followed until petitioner reinstated his visitation after an order of protection was entered; thereafter, petitioner "insisted" on keeping R.G. past his agreed drop-off time. This modified drop-off schedule was utilized for about a month before respondent filed the motion to modify parenting time. In communications with petitioner regarding scheduling, respondent suggested returning to the formal parenting plan schedule, even though she does not believe this schedule is the best option.

¶ 20    Kuzniewski also related that an informal change to the parenting-time schedule was being utilized but neither party wished to continue operating under this schedule. She recommended abandoning the formal and informal schedule and, instead, granting petitioner parenting time every Thursday after school until school drop-off the next morning and, on alternating weekends, from Thursday after school until Sunday night at 7:00 p.m. However, she also recommended that weeknight parenting time with petitioner was not in R.G.'s best interests. Kuzniewski explained the dichotomy—she, generally, does not recommended weeknight parenting time when the parties cannot meaningfully communicate and they live a significant distance apart. However, she

recommended a weeknight overnight here because R.G. was already accustomed to the arrangement and there was no petition to restrict petitioner's parenting time. She also indicated that any concerns raised about R.G. missing school on Fridays seem to have been resolved. Kuzniewski suggested the change in schedule because she believed it was in the best interest of R.G. to have full weekends with both of his parents. However, she noted that petitioner would lose some overnights with R.G. She suggested that the court could accommodate the loss of petitioner's parenting time during summer break, if desired.

¶ 21  Kuzniewski also testified that she investigated two incidents that occurred with R.G. on the school bus (once, a peer and R.G. were playing and R.G. got hit in the groin and, another time, R.G. was spit on). She affirmed that the hitting incident involving R.G. and another peer was not sexual assault, even if R.G. did not hit his peer back, because reports indicated there was no sexual intent; it was a game. The issue was resolved by separating the boys on the bus. The spitting incident was also immediately addressed by moving R.G. to another seat. She believed that reallocating decision making responsibility to petitioner was not in R.G.'s best interests because she was concerned with petitioner's response to these events. She found that his conduct might be considered as "seriously endangering the child's mental, moral, or physical health or [ ] significantly impair[ing] the child's emotional development."

¶ 22  Kuzniewski investigated an incident involving a "long black gun" that R.G. found while playing hide-and-seek at respondent's house. After interviewing respondent, she confirmed that the "gun" was in fact a BB gun and she believed it had been removed, locked up, or otherwise addressed. She felt that this was promptly dealt with, so it was not included in the report.

¶ 23  Regarding R.G.'s dental care, petitioner alleged that respondent failed to inform him of dental appointments and that she neglected R.G. by delaying dental care. Respondent related that

petitioner was aware of and attended a prior dental appointment. He was also notified of R.G.'s emergency dental issues. He was not told about routine cleanings because respondent had the impression these appointments were not important to him, and all the appointments were scheduled during her parenting time. Respondent related that she took R.G. to the dentist every six months, and he had several cavities filled. There was a delay in completing dental work because the fillings needed to be performed over several appointments and there was an emergency abscess that was addressed in between R.G.'s regular appointments. At the appointments, the dentist never conveyed a timeframe for when the dental work would need to be completed. Overall, R.G.'s dental issues involved his baby teeth, not his adult teeth, and were resolved.

¶ 24    Kuzniewski also testified about R.G.'s dental care and petitioner's allegations of neglect at respondent's home. She asserted that both parents have a responsibility to maintain R.G.'s health, including his dental health. Kuzniewski acknowledged, however, that respondent has decision-making responsibility regarding this care. In her report, she intended to convey that both parties have an obligation to ensure R.G.'s needs are met and that his needs took precedence over any issues a parent had with *how* those needs were met. Kuzniewski did not make a specific finding regarding petitioner's allegations of respondent's neglect in obtaining dental care for R.G. She did, however, believe that the gap in dental care may have been partially explained by healing time from other procedures and respondent's decision to find alternate dental care providers for routine and intensive dental visits, as R.G. was now seeing two dentists. Overall, she believed that the dental work was completed, and there were no long-term issues.

¶ 25    Kuzniewski also discussed petitioner's education concerns regarding R.G. She recalled a request by petitioner to have R.G. tested for dyslexia. She did not recall if R.G. was ever assessed; however, she stated that R.G. reads at an advanced level for his grade. Respondent, however,

testified that she met with R.G.'s pediatrician and teachers and they did not recommend testing for dyslexia.

¶ 26    Next, respondent testified that R.G. had been enrolled in and completed counseling. She provided information for the intake form to Martha Ortiz, R.G.'s counselor at A Safe Place, sometime in September or October, prior to taking R.G. to counseling. Petitioner believed that respondent told him that she had contacted a therapist for R.G.; however, he was never told that the child began counseling. Respondent stated that R.G. was enrolled in counseling because there was a domestic dispute that happened during a parenting time hand-off. R.G. was upset after the incident and had a hard time sleeping. Respondent called Turning Pointing for counseling services and, eventually, was given a referral to A Safe Place. During intake, respondent related that there were domestic dispute issues regarding the father, difficulties with the stepmother, attachment issues, family functioning issues, and sleep issues.

¶ 27    Kuzniewski investigated R.G.'s participation in counseling. She noted that, except for starting counseling, respondent communicated with petitioner regarding all significant decisions for R.G. She confirmed with Ortiz that petitioner was not involved in R.G.'s counseling. She stated that Ortiz was working with R.G. because of exposure to domestic violence beginning at age four and, additionally, because of an incident involving petitioner and his wife. An agreed order directed counseling for R.G. and stated that "[e]ach party shall cooperate and participate in the counseling as directed by the Counselor," and she believed that petitioner was not directed to participate because the issues involved petitioner and domestic violence. She was, however, concerned with petitioner's conduct after discovering R.G. was enrolled in counseling. He caused unnecessary litigation, expense, and time and interfered with R.G.'s counseling by filing an order of protection in Kane County because he alleged that he was denied information and access to the

child's counseling. Overall, Kuzniewski concluded that reallocating decision making responsibilities was not in R.G.'s best interests here, because she was concerned with the intensity of petitioner's response, and his interest in terminating counseling.

¶ 28    During Kuzniewski's examination, petitioner sought to admit exhibit No. 85, the IM-CANs report made by Ortiz. Respondent's counsel noted that the proper foundation had not been laid for the admission of this report. The court sustained the objection and told petitioner that he needed to lay a "business record foundation" for the exhibit including, "how the document is kept, how it is created, the timing of the creation, none of which I know from Miss Kuzniewski."

¶ 29    Ortiz then testified that she completed the IM-CANs assessment for R.G. with information she obtained from the child and respondent. She indicated that she was not required to speak with petitioner to complete the assessment. Ortiz briefly explained how she collects and records data from clients and inputs it into an online system, which then compiles the data for the IM-CAN report. This information is then used by practitioners to formulate a treatment plan and evaluate the client's needs. She was unable to confirm when the assessment was completed here because several dates were listed on the report, and she believed that some dates may have been impacted by her supervisor's approval of the assessment and updated progress notes. Petitioner, again, sought admission of exhibit No. 85. Respondent objected, arguing both that the proper foundation was not laid and that petitioner failed to show that Ortiz was the record's custodian. The objection was, repeatedly, sustained.

¶ 30    Next, petitioner called his wife, Tien Johnson; Chanel Tran, his foster daughter; Scott Gorrill, his brother; Diane Johnson, his stepmother; Sidney Scott Johnson, his father; and Janusz Pikul, his neighbor. The witnesses all described petitioner's positive relationship with R.G. Petitioner also testified about his positive relationship with R.G. and the child's connection to his

family and the community. As such, he wished to keep the parenting schedule the same, or as close to equal parenting time as possible. Alternatively, petitioner stated that he would be agreeable to transitioning R.G. into school near him (and providing him with substantial parenting time during the school year) and granting respondent more parenting time in the summer to account for his school-year time.

¶ 31 The court issued oral and written findings on May 18, 2023. It denied October 4 petition for rule to show cause and granted, in part, the motion to modify parenting. As to the rule to show cause, the court found that its order for counseling did not specify a timeframe or practitioner requirement; thus, respondent could not be held in contempt based on elements of the order that were never addressed. Moreover, the court determined that there was no evidence that respondent somehow blocked petitioner's involvement in R.G.'s counseling.

¶ 32 As to parental responsibilities and parenting time, the court stated that it considered the law, existing parenting plan, testimony, exhibits (addressed and unaddressed at the hearing), witness' demeanors, and the GAL report. It referenced its concern that the parties now lived about one hour apart, but that this alone did not constitute a substantial change in circumstances because the relocation of the parties was anticipated. However, it found that R.G. starting school constituted a substantial change in circumstances, especially considering that the parties had been exercising their own schedule due to this fact.

¶ 33 In determining whether the substantial change in circumstances warranted a change going forward, the court considered several best-interest factors. As to the wishes of each parent, it noted that petitioner testified he was satisfied with the parties' course of conduct; however, respondent desired entire weekends with R.G. The court found that R.G. seemed well-adjusted in his family, school, and community. It noted that it had heard significant testimony regarding R.G.'s positive

relationships with friends and family and each parent's participation in decision making activities. The court considered whether R.G.'s needs were met and found that both parties seem very capable and willing to care for the child.

¶ 34    Regarding R.G.'s mental and physical health, the court found that the disputed issues were resolved. The court stated that, despite significant questioning of R.G.'s counselor, there was no testimony regarding the sufficiency of R.G.'s counseling or whether R.G.'s treatment should continue. However, based on the GAL report, R.G.'s counseling appeared to have gone well up to its conclusion. Regarding R.G.'s dental health, the court found that R.G.'s dental hygiene issues were resolved and, without evidence to the contrary, there were no apparent issues going forward. Looking at R.G.'s school bus incidents, there was no evidence that the hitting related to sexual abuse, and the hitting and spitting behaviors ceased after being addressed with school administrators. Overall, the court found that there was no evidence to support that respondent was at fault or that her parenting time or decision making responsibility should be modified.

¶ 35    Next, the court found that the parties faced significant barriers to effective communication. Specifically, it stated that it read through hundreds of messages, included in exhibit No. 5. In these messages, it found that petitioner's communication was often accusatory, condescending, and off-putting. Accordingly, it admonished him to place R.G.'s needs above his own and to cease any discussions with R.G. about pending litigation, as that was "the quickest way for [him] to find [his] parenting time diminished." However, overall, it found that the parties' communication was not a reason to reduce petitioner's parenting time.

¶ 36    The court also considered the GAL report and found that, "[i]n some ways, I agree with her. In some ways, I do not." For example, it discounted the GAL's conclusions regarding an

alleged firearm R.G. discovered. Instead, the court concluded that the "firearm" appeared to be a BB gun, and after the issue was discovered, it was dispatched.

¶ 37    In sum, the court found that it was unnecessary to change decision making responsibilities or to deviate significantly from the parties' course of conduct; however, it found that it was important for both parties to have stretches of time over the weekend with R.G. As such, it granted petitioner parenting time from Thursdays at 5:30 p.m. until Friday morning drop-off at school, or 5:30 p.m. if there was no school. On the alternate week, he would have parenting time from Thursdays at 5:30 p.m. until Monday morning drop-off at school, or 5:30 p.m. if there was no school. Holidays and vacation time remained unchanged.

¶ 38    On June 2, 2023, respondent moved to reconsider or, in the alternative, for clarification. Petitioner filed a notice of appeal on June 15, 2023, while the motion was pending. He then responded to the motion on June 28, 2023. A hearing was set for July 17, 2023, but an order was entered on July 31, 2023, denying the motion to reconsider. On our own motion, this order was supplemented to the record on November 7, 2023.

¶ 39    On August 14, 2023, petitioner moved to supplement the record on appeal with various (admitted and unadmitted) exhibits from the modification hearing. Respondent objected and, specifically, indicated that exhibit No. 85, the IM-CAN report, was not admitted during the hearing. We denied the motion to supplement, without prejudice, and directed that petitioner could file an amended motion to supplement that also included, (1) complete copies of the exhibits and (2) an affidavit attesting to the accuracy and completeness of those exhibits. Petitioner refiled his motion to supplement, excluding exhibit No. 85. The motion was granted over respondent's objection.

¶ 40    On August 31, 2023, petitioner moved to supplement his opening brief to address the circuit court's alleged improper exclusion of exhibit No. 85 from the modification hearing. The supplement was allowed over respondent's objection and filed on September 13, 2023. Thereafter, respondent moved to supplement the record with the exhibits admitted at the modification hearing. We granted the motion.

¶ 41                                II. ANALYSIS

¶ 42    Prior to discussing petitioner's arguments, we address the timeliness of this decision. This case is designated as "accelerated" pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), because it involves a matter affecting the allocation of parenting time. Rule 311(a)(5) provides, in relevant part, that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." In this case, petitioner filed his notice of appeal on June 15, 2023. Thus, the 150-day period to issue our decision expired on November 13, 2023. We note, however, that both parties were allowed to supplement the record with additional exhibits and, on September 8, 2023, petitioner was granted leave to supplement his opening brief. As such, a revised briefing schedule was entered, allowing respondent until October 6, 2023, to file her brief, and petitioner until October 13, 2023, to file his reply brief. Respondent timely filed her response brief. Petitioner did not file a reply brief. As a result of the foregoing, the case was not submitted for a decision until October 19, 2023.

¶ 43    Once the case was submitted for decision, we discovered a jurisdictional issue not addressed by the parties. This required us to *sua sponte* order additional portions of the record, which we received on November 7, 2023. Since this case was not ready for disposition until November 7, 2023, we find good cause for issuing our decision after the 150-day deadline. See *In*

*re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26 (finding good cause where the briefs were filed after the initial briefing deadlines but one week before the 150-day deadline).

¶ 44                                    A. Jurisdiction

¶ 45    Next, we must address whether we have jurisdiction to hear this appeal. The parties do not thoroughly address jurisdiction in their briefs. Our jurisdiction is dependent on the appellant's timely filed notice of appeal. *Huber v. American Accounting Ass'n*, 2014 IL 117293, ¶ 8. Under Illinois Supreme Court Rule 303(a), a party wishing to appeal must file a notice of appeal "within 30 days after the entry of the final judgment appealed from" or "within 30 days after the entry of the order disposing of the last pending postjudgment motion," if one has been filed. Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). A notice of appeal filed before an order disposing of a postjudgment motion becomes effective when the order disposing of the motion is entered. Ill. S. Ct. R. 303(a)(2) (eff. July 1, 2017). Where the postjudgment motion is, eventually, denied, an appeal from the original judgment "is deemed to include an appeal from the denial of the postjudgment motion." *Id*. However, if a party intends to challenge the order disposing of a postjudgment motion, he or she must file either an amended or new notice of appeal within 30 days. *Id.*

¶ 46    Here, a final judgment regarding several motions was issued on May 18, 2023. On June 2, 2023, respondent moved to reconsider or, alternatively, provide clarification regarding the May 18 order. Thereafter, on June 15, 2023, petitioner filed a notice of appeal. Eight days later, a hearing on the motion to reconsider was set for July 17, 2023; however, an order denying the respondent's motion to reconsider was, ultimately, filed July 31, 2023.

¶ 47    Under Rule 303(a)(2), petitioner's notice of appeal filed on June 15, 2023, was premature and only became effective after the motion to reconsider was decided on July 31, 2023. Because

no new relief was provided, a new or amended notice of appeal is not required. *Id.* Accordingly, we have jurisdiction to consider the instant appeal.

¶ 48                                     B. Briefing

¶ 49      Petitioner appears *pro se* in this appeal. A *pro se* appellant is expected to comply with the same rules as a litigant represented by an attorney, and courts will not treat the *pro se* litigant's submissions more leniently. *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 78. Petitioner's brief is deeply problematic. It is littered with irrelevant facts, mischaracterizes court rulings, and, at times, lacks citations to the record. Ill. S. Ct. R. 341(h)(6)-(7) (eff. Oct. 1, 2020). The brief does not accurately address our jurisdiction and, in fact, we *sua sponte* ordered the circuit clerk to supplement the record to resolve a jurisdictional issue. Ill. S. Ct. R. 341(h)(4) (eff. Oct. 1, 2020). More troubling still is petitioner's sparse citation of cases and has citation to repealed statutes, which do not support his stated proposition and, in some instances, undermine his position. While we have the discretion to strike petitioner's brief or even to dismiss the appeal, this is an accelerated case dealing with the allocation of parental responsibilities, it thus militates in favor of resolving the issues presented. *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 12. As such, we address petitioner's arguments, insofar as we are able.

¶ 50      Turning to the merits, petitioner raises six arguments on appeal. He argued that the circuit court erred: (1) in denying his petition for rule to show cause based on respondent's failure to place R.G. in counseling; (2) where it failed to make findings on the petition for rule to show cause based on respondent's alleged violation of the parenting plan; (3) where it improperly considered evidence that was not presented during the hearing; (4) by decreasing petitioner's parenting time; (5) when it dismissed petitioner's motion to reallocate parental responsibilities; and (6) by

excluding exhibit No. 85, the IM-CAN report, from evidence. For the following reasons, we affirm the decision of the circuit court.

¶ 51                    C. October 4, 2021, Petition for Rule to Show Cause

¶ 52    Turning to petitioner's first argument, he contends that the circuit court erred by failing to find respondent in contempt of court because she violated the spirit of the parenting plan where she failed to immediately enroll R.G. in counseling. Specifically, petitioner claims that respondent violated the "mend the hold" doctrine and the doctrine of good faith and fair dealing. We find petitioner's arguments unpersuasive.

¶ 53    It appears petitioner sought an order finding respondent in indirect civil contempt of court. Indirect civil contempt occurs when a party fails to do something ordered by the court, outside the presence of the court, resulting in the loss of benefit or advantage to the opposing party. *In re Marriage of Betts,* 200 Ill. App. 3d 26, 43-44 (1990). The goal of civil contempt proceedings, generally, is "to compel the contemptor to perform a particular act." *Id.* at 43. To sustain a finding of indirect civil contempt, the petitioner must show, by a preponderance of the evidence, that an order of the circuit court exists and proof of willful disobedience of that order. *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). We will not disturb the circuits court's findings regarding whether a party is guilty of contempt unless they are against the manifest weight of the evidence, or the record reflects an abuse of discretion. *Id.* at 108. We conclude that the circuit court neither abused its discretion, nor reached a decision contrary to the manifest weight of the evidence when it denied the petition for rule to show cause.

¶ 54    In this case, petitioner petitioned for a rule to show cause because respondent "failed to fulfill her end of the agreed order by not taking [R.G.] to counseling as agreed." However, it is undisputed that, at the time of the hearing, respondent had taken R.G. to counseling. Petitioner

essentially complains that respondent acted in bad faith and violated the "mend the hold" doctrine by *delaying* R.G.'s entry into counseling. The circuit court found that the agreed parenting plan did not require a specific counselor or a specific timeframe in which R.G. needed to be enrolled in counseling. Moreover, there was no evidence that the counselor tried to involve petitioner or respondent precluded his involvement. Accordingly, the court concluded that there was not enough evidence to find that respondent violated the court's order and, thus, the petition was denied.

¶ 55    We conclude that the circuit court's denial of the petition for rule to show cause was not against the manifest weight of the evidence and did not reflect an abuse of discretion. Petitioner failed to satisfy his evidentiary burden that respondent was required to enroll R.G. in counseling by a specified date. The order requiring counseling for R.G. was filed on August 6, 2021, and did not state a timeframe in which counseling would need to be sought or completed. Nonetheless, nearly two months later, on October 4, 2021, petitioner petitioned for a rule to show cause based on respondent's failure to enroll R.G. in counseling. We find that two months is not an unreasonable amount of time to search for an in-network counselor, schedule an appointment, and complete intake with the selected counselor, especially considering respondent's uncontested testimony that she called at least two service providers, and one provider took a month to return her call. As such, we find that respondent did not act in bad faith by failing to immediately have R.G. enrolled in counseling. Finally, we conclude that the "mend the hold" doctrine is irrelevant since the record contains no evidence that respondent changed her reason for the minor delay in starting R.G.'s counseling. See *Trossman v. Philipsborn*, 373 Ill. App. 3d 1020, 1042 (2007) (defining the "mend the hold" doctrine as: "[w]here a party gives a reason for his [or her] conduct and decision touching anything involved in a controversy, he [or she] cannot, after litigation has begun, change his [or her] ground and put his [or her] conduct upon another and different

consideration."). Accordingly, we conclude that it was not manifestly erroneous and did not reflect an abuse of discretion for the court to dismiss the petition.

¶ 56                    D. March 14, 2023, Petition for Rule to Show Cause

¶ 57    Next, petitioner asserts that the circuit court erred where it failed to provide any findings or make a ruling on petitioner's March 14 petition for rule to show cause and, thus, respondent should be found in indirect civil contempt based on the evidence introduced at the April hearing. This issue is not properly before us; thus, we will not address the merits.

¶ 58    Petitioner contends that, on March 14, 2023, he filed a "consolidated motion for leave of court to file a petition for rule to show cause" against respondent and that she never responded to the petition or presented evidence contradicting the petition at the April hearing. However, petitioner mischaracterizes the procedural posture of the petition, which dictates the outcome on appeal.

¶ 59    On September 27, 2022, petitioner petitioned for a rule to show cause, which was the initial iteration of the March 14 petition. On September 30, 2022, the circuit court granted respondent 21 days to file a response to the petition. Nearly two weeks later, respondent moved to dismiss the petition. 735 ILCS 5/2-615 (West 2022). On October 28, 2022, petitioner was then given 21 days to respond to the motion to dismiss and told that he was not permitted to file any new motions or petitions without leave of the court. Petitioner never responded. Accordingly, on December 1, 2022, the motion to dismiss was granted and the petition for rule to show cause was dismissed, without prejudice. The court then granted petitioner leave to file an amended petition within 21 days, or until December 22, 2022. He did not file anything until March 14, 2023, wherein he alleged that, on October 26, 2022, he was granted leave to amend his previously filed petition for rule to show cause. However, the only order entered was on October 28, 2022, which granted

petitioner 21 days to respond to the respondent's motion to dismiss the rule to show cause. He was not granted leave to file an amended petition on this date. Further, any time he was given to amend the previously filed petition for rule to show cause expired on December 22, 2022. Accordingly, petitioner needed to obtain leave from the court to file this petition.

¶ 60    After filing the amended petition on March 14, 2023, petitioner failed to present the petition to the court and set the petition for a hearing. In fact, at the open and close of the April hearing, the circuit court summarized the pending motions and petitions, which were to be ruled on. The March 14 petition was not included in this list, and petitioner did not inform the court of his petition. Local Rule 2.01(m) provides that "[t]he burden of calling for hearing any motion previously filed is on the party making the motion." 22nd Judicial Cir. Ct. R. 2.01(G), (H), (M) (eff. Jan. 2, 1997). Thus, pursuant to Rule 2.01(m), defendant carried the burden to seek leave of court to file his petition and call it for hearing. Because he failed to do so, we presume the motion was waived or abandoned. *Mortgage Electronic Systems v. Gipson*, 379 Ill. App. 3d 622, 628 (2008); *People v. Brusaw*, 2023 IL 128474, ¶ 17. As petitioner never requested a ruling on his request for leave to file the petition, we find no error on the part of the circuit court in failing to address any issues contained therein.

¶ 61                      E. Admission of Evidence at the April 2023 Hearing

¶ 62    Petitioner argues that the circuit court abused its discretion when it reallocated the parties' parenting time because it "depressed" petitioner's evidence admitted during the April hearing but considered evidence that respondent did not present or argue. We conclude that the circuit court did not err in considering petitioner's evidence; rather, he invited the error of which he now complains. Therefore, he is precluded from relying on this claim as a basis for relief.

¶ 63    Under the doctrine of invited error, also described as acquiescence or estoppel, a party cannot complain of error that he or she induced the court to make or to which that party consented. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). The purpose of this doctrine is to uphold the fairness of the proceedings, as it would be manifestly unfair to allow a party a second bite at the apple based on an error that he or she injected into the proceedings. *Id.*

¶ 64    At issue here is the circuit court's consideration of communication between the parties included in exhibit No. 5. Petitioner moved to admit exhibit No. 5 into evidence at the April hearing. It consisted of 119 pages, predominantly of communications between the parties, the GAL, and the attorneys. At the time of admission, the court repeatedly stated that it would read the entirety of the exhibit, even if not discussed by the parties.

¶ 65    On May 18, 2023, the court made oral and written findings regarding the April hearing. As to the modification of parental responsibilities, the court found a substantial change in circumstances and considered whether a change in the parenting plan would serve R.G.'s bests interests. In making its determination, the court examined exhibit No. 5, including communications not specifically discussed by petitioner at the hearing. It found that petitioner's messages were often condescending and off-putting. As such, it read a portion of petitioner's messages into the record to highlight its concern that petitioner needed to place R.G.'s needs above his own. However, the court specifically noted that it found that the parties' communication was not a reason to reduce petitioner's parenting time.

¶ 66    Petitioner, having sought admission of the evidence and procured a ruling from the court in accordance with his view, cannot now insist that the examination of his own evidence was an abuse of discretion. Accordingly, we conclude that petitioner may not now attack the consideration of evidence which he initially admitted.

¶ 67 F. Motion to Modify Parenting Time and Decision Making Responsibility

¶ 68 Central to this appeal, petitioner alleges that the circuit court erred by reallocating 24 overnights of his parenting time to respondent and refusing to reduce respondent's decision making responsibilities. He claims that the circuit court erred by finding that (1) a substantial change in circumstances had occurred regarding parenting time; (2) it was improper to reduce his parenting time to serve R.G.'s best interests; and (3) it was improper to deny the modification of the decision making responsibilities that were in R.G.'s best interests. Initially, petitioner asserts that these issues are moot. However, we find that they are not moot as they were still in dispute at the time of the hearing as evidenced by the GAL's report and petitioner's own motion filed almost one week before the April 2023 hearing.

¶ 69 A parent who was not granted significant decision-making responsibilities or parenting time of their child in the original allocation of parental responsibilities may seek modification of a parenting order, pursuant to section 610.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act). 750 ILCS 5/602.8, 610.5 (West 2020). Section 610.5(c) provides that the circuit court has the authority to modify a parenting plan or allocation judgment, "if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment ***, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." *Id.* § 610.5(c).

¶ 70 In determining the best interests of the child for purposes of allocating parenting time and decision-making responsibilities, the circuit court should consider, *inter alia*, (1) the wishes of each parent; (2) the wishes of the child (depending on his or her maturity and ability to express well-reasoned preferences); (3) the time each parent spent, within the preceding 24 months,

performing caretaking functions; (4) any prior agreement or course of conduct between the parents relating to caretaking functions; (5) the interaction and interrelationship of the child with parents, siblings, and other significant persons; (6) the child's adjustment to home, school, and community; (7) the mental and physical health of the parties; (8) the child's needs; (9) the distance between the parents' residences, the difficulty of transporting the child, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) the presence or threat of physical violence or abuse perpetrated by the parent and directed against the child or other household members; (12) the willingness and ability of each parent to place the needs of the child ahead of one's own; (13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the ability of the parents to cooperate to make decisions; and (15) any other factor the court expressly finds to be relevant. 750 ILCS 5/602.5(c), 602.7(b) (West 2020).

¶ 71    Allocating parenting time and decision-making responsibilities is within the discretion of the circuit court. Accordingly, we provide great deference to the court when reviewing the modification of a parenting plan because it is in the best position to assess witness credibility and determine the child's best interests. *In re Marriage of Wendy L. D. & George T. D., III*, 2017 IL App (1st) 160098, ¶ 76. We will overturn the modification of a parenting plan only if it is against the manifest weight of the evidence. *Id.* A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the judgment is arbitrary, unreasonable, or not based on the evidence. *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 27.

¶ 72    The first prong of section 610.5 requires the petitioner to show that a substantial change in circumstances has occurred. The record shows that the initial parenting order was entered when R.G. was four years old—prior to starting school. R.G. was in second grade at the time the parties

requested a modification of the parenting plan. The parenting plan entered on June 27, 2019, did not discuss a parenting schedule for after R.G. started school. The parties' testimony at the April 2023 hearing reasonably showed that their ability to adhere to the original parenting schedule was hindered by R.G.'s school schedule. They even testified that they had been exercising a modified schedule since R.G. returned to school. Based on this evidence, the circuit court found there was a substantial change in circumstances.

¶ 73 Here, we cannot say that the court's decision was against the manifest weight of the evidence. The original parenting plan did not contemplate a parenting-plan schedule for after R.G. started school. It was not unreasonable for the court to find that, in the nearly four years since filing the parenting plan, R.G. attending school and his resulting schedule change was a substantial change that warranted a modification of the parenting plan, especially since the parties themselves found that an adjustment to the parenting schedule was necessary.

¶ 74 Next, petitioner asserts that the informal schedule change should not be considered a substantial change in circumstances. However, we note that petitioner asserted in his response to respondent's motion to modify parenting time and in his own brief that a substantial change in circumstances occurred that necessitated a change to the parties' parenting time and decision making responsibilities. Even setting aside this concession, a change in schedule can be considered by the court in determining whether there is a substantial change in circumstances. 750 ILCS 5/602.5(c)(6), 602.7(b)(4) (West 2020). The parties may work out an informal schedule if the court sanctioned schedule is not in the best interests of the child. Accordingly, the court is empowered to consider the parties' course of conduct if an alternate schedule is utilized. *Id.* Both parties testified that circumstances had changed and that precipitated the informal schedule. Moreover, petitioner stated that he wished to keep the schedule as is (meaning 130 overnights). In sum, we

find petitioner's arguments unpersuasive regarding the court's consideration of the informal schedule or the inadequacy of that schedule, where petitioner's brief and testimony undermine this argument and sections 602.5(c) and 602.7(b) empower the court to consider this evidence.

¶ 75 Petitioner asserts that a substantial change in circumstances did not occur, considering that a modification of the parenting plan was denied on October 8, 2020, after R.G. was in school. However, when looking at the motion to modify the agreed parenting plan filed on December 26, 2019, R.G. starting school was not considered by the court as a reason for finding a substantial change in circumstances. Instead, respondent sought to change the parenting plan to reflect the time R.G. actually spent with petitioner. The circuit court found that petitioner's infrequent failure to exercise parenting time was not significant enough to establish a change in circumstances. As such, petitioner's argument that R.G.'s school schedule was not a proper basis to justify a change in circumstances because R.G. was in school at the time of the October 8 order is not persuasive, as R.G.'s schooling was not accounted for in the court's decision.

¶ 76 The court's finding under the second prong of section 610.5(c), the best interests of the child regarding parenting time and decision-making responsibilities, is also supported by the evidence. The circuit court stated that it considered the factors found in section 602.5(c) and section 602.7(b) in coming to its decision. The agreed parenting plan provided that petitioner had parenting time on 156 overnights (plus 10 summer vacation overnights) beginning on Tuesday at 7:00 a.m. until Thursday at 6:15 a.m., with alternating weekends starting on Friday at 7:00 p.m. until Sunday at 7:00 p.m. Petitioner stated that he exercised parenting time every Thursday at 5:30 p.m. until Sunday at 5:30 p.m., but, on the alternating week, he would have R.G. from Thursday at 5:30 p.m. until Saturday at 5:30 p.m. This amounts to 130 overnights (plus summer vacation). The court found that petitioner was satisfied with the parenting schedule as exercised and that he

did not want his parenting time reduced; however, respondent wished to have entire weekends with R.G. Regarding R.G.'s preference, the court found that, given his age and maturity, it would not hear directly from the child; however, it noted that R.G. continues to do well with both parties and their families, in his community, and in school. The distance between the parties' homes (one hour commute) was not ideal, but it also was not insurmountable.

¶ 77    Testimony showed that R.G. was in counseling, which went well up to its conclusion. There was no indication that the counseling was inadequate or that further counseling was required. It also found there was initially a concern with R.G.'s dental hygiene but those issues were resolved. The court did not hear any testimony indicating that there would be a problem with dental hygiene going forward or that there were any long-term issues; thus, the court found the issue was not significant enough to require a change. It also stated that the hitting and spitting incidents on the school bus did not warrant a change in parenting time because the incidents were addressed with school officials and were resolved.

¶ 78    Further, despite an order of protection (stemming from a parenting time exchange), the court found that there was no violence, threat of violence, or abuse, and it did not appear that volatile exchanges continued to occur. Overall, parenting restrictions were found to be inappropriate, as neither parent seriously endangers R.G.'s mental, moral, or physical health.

¶ 79    The court recognized that the parties have difficulty cooperating and making decisions but noted that some decisions regarding R.G.'s participation in extracurricular activities were made. It believed that both parties clearly care and provide for R.G.; however, in considering whether petitioner puts R.G.'s needs above his own, it found that petitioner often accused and condescended to respondent. The court stated that it paid special attention to the exhibits addressed at the hearing but also came across "hundreds and hundreds" of "off-putting" communications, an

example of which was read into the record. The court directed petitioner to reexamine his willingness to work with the respondent and to put R.G.'s needs above his own. Moreover, the court cautioned petitioner to keep R.G. out of the litigation because that is the "quickest way for you to find your parenting time diminished ***." However, it determined that the parties' difficulty communicating was *not* a reason reduce petitioner's parenting time.

¶ 80 The court went on to note that it considered the GAL's report, but it did not wholesale adopt the findings of the report. It found that the GAL did not improperly speak with respondent's counsel or the attorney representing R.G.'s prior counseling facility; instead, the GAL investigated R.G.'s need for counseling, which was within her purview while she determined the best interests of R.G.

¶ 81 Overall, the court concluded that it was not necessary to greatly deviate from the GAL's recommendations or the original parenting plan, but it was also appropriate to award "blocks of time" to each parent outside of school. Accordingly, it denied the motion to reallocate decision making responsibilities to petitioner and, technically, reduced his parenting time but noted that the number of overnights was consistent with the parties' *de facto* schedule. Most importantly, the court's decision allowed both parties prolonged weekend parenting time with R.G.

¶ 82 The court's findings were not against the manifest weight of the evidence. The court did not modify decision-making responsibility and did not dramatically change the parenting schedule, it only reallocated 24 overnights, which conformed to the parties' course of conduct. The slight shift in the schedule, however, addressed the issue the court found most important—equal extended weekend parenting time. By making this shift in the schedule, the court was able to provide more equal extended parenting time to both parties, with R.G.'s school schedule in mind.

¶ 83     Petitioner next takes issue with the court's consideration of the GAL report. However, the court may consider the report in determining the child's best interests. 750 ILCS 5/604.10 (West 2020). Moreover, petitioner's issues with the report are, overall, unpersuasive because the court stated that it did not overly rely on it. In fact, the court noted that in several respects, it did not agree with the report. Nothing in the record indicates that the court afforded excessive deference to the report, especially considering that not all the GAL's suggestions were adopted. Accordingly, the court did not err by considering the report.

¶ 84     Petitioner's argument that the court improperly considered his "off-putting" communications when it reallocated parenting is not persuasive because the court specifically noted in its findings that it did *not* use the parties' communications as a basis to reduce parenting time. The court's statements were merely an admonishment to petitioner to reconsider his prioritization of R.G.'s needs.

¶ 85     Next, petitioner asserts that the circuit court did not properly consider testimony from his wife, foster daughter, and parents regarding petitioner's efforts to help R.G. foster these relationships. Specifically, petitioner opines that his father was blocked by respondent from having R.G. visit him in Florida. Petitioner's argument is not supported by the record. Johnson's testimony shows that he visited R.G. in Illinois three times in the last year, but no reason was given for why R.G. had not been to Florida. Further, an amended travel order was entered in June 2023 that allows R.G. to travel to Florida. As such, petitioner's assertions that respondent blocked R.G.'s travel to Florida are not developed in this record. Moreover, the court, specifically, considered the close relationships that R.G. had built at both parents' houses in examining R.G.'s best interests. We find that the court's assessment was not against the manifest weight of the evidence.

¶ 86    Additionally, petitioner's argument that respondent was not properly caring for the child's mental and physical needs because of two school-bus incidents, allegations of dyslexia, a "gun" discovery at respondent's house, R.G.'s dental issues, and R.G.'s enrollment in counseling are not persuasive. The court found, in line with the evidence at the hearing, that these issues were resolved (R.G. completed counseling, his dental work was completed, and there were no further school-bus incidents after speaking with school administrators) and that there was no evidence indicating long-term problems. In fact, R.G.'s medical records demonstrate that he has no issues, and all of the dental work completed was on R.G.'s baby teeth, which he will eventually lose. If petitioner believed that long-term problems existed, the onus was on him to question dental experts and mental health professionals about potential long-term impacts of respondent's "neglect." He did not do that, and the remainder of the evidence reasonably showed a healthy, well-adjusted child.

¶ 87    Further, the evidence showed that R.G. discovered a BB gun, not a firearm, in respondent's basement. The court specifically stated that it gave this concern weight in making its final decision; however, there was no evidence indicating that firearms, generally, were assessable to R.G., and the BB gun at issue was dispatched. Accordingly, this issue is also resolved. Moreover, we find that petitioner's claims that R.G. needs to be tested for dyslexia are not meritorious. The uncontested evidence shows that respondent spoke with R.G.'s teacher and pediatrician about testing him for dyslexia and that they did not recommend it. Further, R.G.'s grades reflect that he is reading above grade level. As such, petitioner's claims that respondent's parenting time and decision-making responsibilities should be reduced because R.G. has not been tested for dyslexia are unfounded. Considering the standard of review and the evidence presented, we find that the court did not err in reallocating petitioner's parenting time and denying his motion to reallocate decision making responsibilities.

¶ 88    We will not address petitioner's claims of a double standard, judicial bias, and racial discrimination. Petitioner makes several underdeveloped claims of judicial bias, racial discrimination impacting parenting time, and a "double standard" being applied in favor of respondent. Petitioner does not rely on any case law to support his claims. Bare contentions in the absence of argument or citation of authority do not merit consideration on appeal and are deemed forfeited. *In re H.B.,* 2022 IL App (2d) 210491, ¶ 41. A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cogent arguments presented. This court is not a repository into which an appellant may foist the burden of argument and research, and it is neither the function nor the obligation of this court to act as an advocate or search the record for error. *Id.* Accordingly, these contentions are forfeited.

¶ 89    In sum, we conclude the court properly assessed the GAL's report, found that any mental and physical issues with R.G. were resolved or frivolous, and did not weigh petitioner's communication to his detriment. Accordingly, the court's ruling reallocating parenting time to respondent and denying the motion to reallocate decision making responsibility was not against the manifest weight of the evidence.

¶ 90                              G. Admission of Exhibit No. 85

¶ 91    Finally, petitioner argues that the circuit court erred by excluding exhibit No. 85 as hearsay where it qualified as a business record. Respondent did not address this argument in her brief.

¶ 92    Business records are admissible as an exception to the hearsay rule because of their inherent trustworthiness and reliability. Ill. S. Ct. R. 236(a) (eff. Aug. 1, 1992); *People v. Smith*, 141 Ill. 2d 40, 73 (1991). Rule 236 provides that:

> "Any writing or record *** made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction,

occurrence, or event, if made in the regular course of any business, and if it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility. ***." *Id.*

¶ 93    Because business records are presumed to be accurate, the proffering party need only satisfy the foundational requirements that (1) the record was made in the regular course of business and (2) near the time of the occurrence. *Kimble v. Earle M. Jorgensen Co.,* 358 Ill. App. 3d 400, 415 (2005). The author of the record need not testify or be cross-examined about the contents of the record. A custodian or any person familiar with the business and its mode of operation may provide testimony establishing the foundational requirements of a business record. *In re V.T. III,* 306 Ill. App. 3d 817, 820 (1999).  That the author of a record does not testify affects only the weight, not the admissibility, of the record. Ill. S. Ct. R. 236(a). Once a witness has established the foundational requirements of a business record, "[t]he records themselves should be introduced." *Smith v. Williams*, 34 Ill. App. 3d 677, 680 (1975).

¶ 94    A court's decision regarding the admission of evidence will not be overturned absent an abuse of discretion. *In re Joseph S.*, 339 Ill. App. 3d 599, 608 (2003). A reviewing court may sustain an evidentiary ruling by the circuit court for any appropriate reason, regardless of whether its reasoning was correct. *Kimble,* 358 Ill. App. 3d at 408.

¶ 95    In this case, the court prohibited petitioner from admitting exhibit No. 85 into evidence while examining the GAL because he failed to satisfy the foundational requirements for the business-record exception to the hearsay rule. Later, when Ortiz testified about filling out the IM-

CANs assessment, the court, again, found that petitioner failed to establish the foundational requirements—including, that Ortiz was a custodian of the records. The record shows that Ortiz was sufficiently qualified as a records custodian, as she was the author of the report and personally familiar with the business and its mode of operation. See *V.T.*, 306 Ill. App. 3d at 320 (finding that anyone familiar with the business procedures may testify about how the business record was prepared). Accordingly, she would have been properly able to lay the foundation for exhibit No. 85 if she had been asked those questions. However, the court did not err in determining that petitioner failed to establish the document's foundational requirements. Ortiz did not testify that the assessment was made in the regular course of business, she did not discuss the business' record keeping procedures, and she failed to state that the record was made near the time of the occurrence. In fact, the record shows that she could not recall when the assessment was completed, as there were competing time stamps on the document. As such, the foundational requirements to establish exhibit No. 85 as a business record were not satisfied. Therefore, the circuit court did not abuse its discretion in refusing to admit exhibit No. 85 into evidence.

¶ 96                                III. CONCLUSION

¶ 97    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 98    Affirmed.